Hexby W. Lengyel, J.
This is a duly filed claim for personal injuries sustained by the claimant, Germain Tetreault, at about 3:45 a.m. of March 20, 1963, when a tractor-trailer which he was operating skidded and jackknifed on Route 9 in the Village of Elizabethtown, Essex County, New York. A duly filed claim is also made by Maislin Bros. Transport, Ltd., as the owner of the trailer and lessee of the tractor, for property damage, wrecking service and loss of use of said vehicles.
The Assistant Attorney-General moved to dismiss the claim of Maislin Bros, Transport, Ltd., on the ground that it was a foreign corporation doing business in the State of New York and had not filed a certificate of authority with the Secretary of State, The corporate claimant was not licensed to do business in New York State until November 18, 1964, The basis for said motion was section 1312 of the Business Corporation Law which provides that an unauthorized foreign corporation may not maintain any action in the State of New York until *172 said corporation obtains authority to do business in this State. Prior to the enactment of section 1312 and related sections of the Business Corporation Law, an unauthorized foreign corporation was precluded from maintaining an action on contract unless it had obtained a certificate of authority prior to making said contract. (General Corporation Law, §§ 210, 218.) However, before the change in the law, a foreign corporation did not have to obtain a certificate of authority to maintain an action which sounded in tort. (American Typefounders Co. v. Conner, 6 Misc. 391; American Middle East Corp. v. Barouk, 13 A D 2d 919, 920; Matter of Dunkin’ Donuts of America v. Dunkin Donuts, 8 A D 2d 228, 232.) It was the State’s position that, as chapter 855 of the Laws of 1961 which accomplished the aforesaid change in the corporation law, became effective on April 1, 1963, it applied to the claim herein which accrued on March 20, 1963 and was sued on on June 14, 1963. However, said act was amended by chapter 837 of the Laws of 1962 and the effective date of the act was extended to September 1, 1963 (Business Corporation Law, § 1401), several months after said claim was filed. Furthermore, subdivision (d) of section 103 of the Business Corporation Law provides that said act “ shall not affect any cause of action * * * which on the effective date of this chapter, is accrued”. (See Garden State Brickface & Stone Co. v. Oradell Constr. Corp., 44 Misc 2d 22, 23.) Therefore, this corporate claimant was properly before the court and the State’s motion is denied.
The individual claimant, Germain Tetreault, was of French-Canadian lineage and possessed very limited comprehension of the English language. An interpreter was required at his examination before trial and also at the trial. The Assistant Attorney-General pointed out that the corporate claimant, which operates a fleet of trucks from Canada into and through New York State, was under Federal regulation; and, in particular he referred to section 191.7 of part 191 of title 49 of the Code of Federal Regulations, which provided that “Every driver shall be able to read and speak the English language.” Mr. Tetreault certainly demonstrated a very limited ability in this respect. In fact, the danger sign posted near the top of the hill in Elizabethtown which read “10 M P H, Danger, Hill” (Exhibit “ G ”), he read as “10 M P H, Danger, River ”. It was the State’s position that, as this driver was not qualified under said regulation, it was negligence for him to operate a transport vehicle in this State and the claims herein should be dismissed. If we found that the lack of comprehension of English was a proximate cause of the accident, we would dismiss *173 these claims on that ground. However, Mr. Tetreanlt testified that he did not see any signs before he proceeded down the hill. Therefore, his lack of ability to read and speak the English language could not be related to said accident and the State’s motion is denied. However, being interested in the safety of New York highways, we suggest that, if this is an example of the enforcement of Federal regulations, it could bear some investigation by Federal and/or State authorities.
The testimony of Mr. Steiger, safety and maintenance director for the corporate client, established that Maislin Bros. Transport, Ltd., owned the trailer which was involved in this accident and orally leased the tractor from La Salle Transport, Ltd., an interlocking corporation with Maislin. State’s counsel urged that La Salle Transport, Ltd., was the proper party in interest as to the tractor damage and not Maislin. We consider such argument to be specious and without merit. The proof established that Maislin was legally obligated to pay $11,327.08 for tractor repairs, $285 for wrecker service and $1,428.33 as the fair and reasonable value for the loss of use of the tractor for 47 working days. Said corporation has the right to sue for same in this court. (See Berger v. 34th St. Garage, 274 App. Div. 414, mot. for lv. to app. den. 275 App. Div. 660; Hurst v. City of New York, 88 N. Y. S. 2d 98; 2 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 1004.15.)
Mr. Tetreanlt, an experienced tractor-trailer driver, departed from the Maislin terminal at East Rutherford, New Jersey, at 9:30 p.m. on March 19,1963, for Montreal, Canada. He testified that he stopped for about 10 minutes at Warrensburg, New York, approximately 60 miles south of Elizabethtown at 2:00 a.m. He further stated it was raining when he left New Jersey and that the rain changed to snow as he proceeded north. According to Mr. Tetreanlt there were two inches of slush on the road when he stopped at Warrensburg and that it became deeper as he proceeded north. Mr. Tetreanlt had made this trip from Montreal and return on March 12 and 13 and had also proceeded over Route 9, north to south, on March 18. Therefore, to that extent, he was familiar with this highway.
Route 9 in the Village of Elizabethtown, moving south to north, was a long straight-a-way approximately from the village speed sign, Exhibit “ C ”, to the top of the hill in question. At the top of the hill the highway curved to the west and downhill. Near the bottom of the hill, the highway curved to the east into the intersection with Route 9N and then curved sharply to the left or north and across a bridge.
*174 Mr. Tetreault advised the court that he could see only 30 to 35 feet ahead of his rig; that he was driving at 25 to 30 miles per hour through Elizabethtown; that he slowed down to 12 to 15 miles per hour at the top of the hill; and, that he further slowed down to 8 to 10 miles per hour while descending the hill. He stated that he passed a southbound tractor-trailer near the top of the hill and that, as this rig was slightly over the center line, he maneuvered his tractor-trailer to the right to avoid it and then pulled back to the center of his lane. He claimed that, a few moments after he returned to the center of his lane and while he was in the “ S ” curve near the bottom of the hill, his rig started to skid and jackknife. His tractor broke loose from the trailer and went through the east abutment of the bridge and nose down into the stream. The trailer remained upright and rolled across the bridge, coming to rest partially off the side of the road. Mr. Tetreault was apparently thrown from the tractor, as he was located about 15 or 20 feet east of the bridge standing waist deep in the water. He sustained serious injuries which included a three-inch laceration of the scalp; an acromioclavicular separation of the right shoulder with resulting calcification and marked crepitus on movement of the shoulder, an apparent internal abdominal injury which required an exploratory laparotomy; and severe bruising in the area of the left hip with a rupture of the muscle sheath in this area resulting in a very large and disfiguring ceroma. He was 100% disabled as a long distance truck driver and was 25% to 30% permanently disabled as a result of this accident.
Both of the claimants alleged in the filed claims that the State was negligent in the construction, maintenance and repair of said highway, and for failing to erect adequate signs and warnings of the dangerous condition existing. However, in their bills of particulars the claimants only averred negligence by reason of snow, slush and ice on the highway which had not been sanded or salted after due notice. At the trial the claimants’ attorney sought to offer lay testimony as to the banking of said highway in the area of the hill and “ S ” curve. The State objected to such testimony on the ground that it came within the scope of negligence by reason of the construction of said highway and that claimants were limited to the averments of negligent maintenance contained in their bills of particulars. We overruled said objection and permitted said inquiry.
Certainly the law of this State has been that a function of the bill of particulars is to limit the proof that may be introduced at a trial. (D’Onofrio v. Davis, 14 A D 2d 960; Schnell v. New York Tel. Co., 12 A D 2d 523; King v. Craddock, 252 App. Div. *175 719; Smiley Steel Co. v. Schmoll, 200 App. Div. 655, affd. 235 N. Y. 520.) While we consider this to still be the law in this State, we do not consider that blind adherence is required of the trial court to this precept. We believe that, under the liberalized philosophy of pleadings implicit in the CPLR, we must consider the pleadings and the proof within the framework of the case on trial and with an eye to attaining a just result for all parties concerned. We agree with the doctrine stated in Weinstein-Korn-Miller (N. Y. Civ. Prac., vol. 3, par. 3041.22): “ A party should not be foreclosed at trial from pursuing a theory of recovery or any factual inquiry that seems available on the basis of the proof merely because he has failed to specify that theory or to allude to those facts in a bill of particulars. This is not to suggest that a litigant can furnish an uninformative bill or a bill that does not represent his knowledge as of the time of its preparation and then depart from its contents at trial as his pleasure dictates. Such a practice would constitute the type of ambuscade that is abhorrent to any modern procedural system. It is suggested, however, that in the absence of prejudice and bad faith, the court should permit amendment of the pleadings or the bill, on appropriate terms, to conform to the evidence or to allow further evidence even if it departs from the bill of particulars.” The allegations relative to construction, repair and signing contained in these claims were all matters peculiarly within the knowledge of the State Department of Public Works and such knowledge was readily available to the State’s trial counsel. We cannot find that the State’s defense was prejudiced by the omission of these items from the bills of particulars; or, that the State’s trial counsel was surprised. Further we do not believe that claimants’ counsel exercised bad faith in the preparation of the bills of particulars or attempted to “ ambuscade ” the State at the trial.
However, the proof presented merely established that the highway was crowned in the center and banked to the west or to the outside of the curve. There was no expert proof that such was improper construction; or, that the State was in any manner negligent in the construction, repair or signing of the highway. “ Insufficient evidence is, in the eye of the law, no evidence.” (Lopez v. Campbell, 163 N. Y. 340, 348.)
Therefore, before the claimants can succeed in their claims, they must prove negligence on the part of the State in the maintenance of this highway on March 20, 1963.
Two of claimants’ witnesses were tractor-trailer drivers who were proceeding south on Route 9 at the time of the accident. Both of these witnesses stated that it was snowing heavily at *176 2:00 a.m. when they took a rest stop at a diner about 2.5 miles north of Elizabethtown. Allegedly, there were two inches of snow on the road when they stopped and four inches of snow on the road when they left the diner at about 3:00 a.m. They proceeded south to the curve and hill in question and Mr. Montena, one of the drivers, attempted to drive up the hill which had not been sanded or salted. On his third attempt to burn his way up the hill, and when he was slightly past the midpoint of the hill, he observed the Tetreault rig as it arrived at the top of the hill. Montena stated that he blinked his tractor-trailer lights at Tetreault. However, Tetreault stated that although he saw a tractor-trailer proceeding up the hill, which he placed near the top of the hill, he did not see any lights blinked. The Tetreault rig, which was about 45 feet long, 8 feet wide and about 22 tons loaded weight, was proceeding, according to this witness, between 12 to 15 miles per hour when first observed and passed within 12 or slightly more inches of the Montena rig. Mr. Cranston, the second driver who stayed at the bridge, estimated the Tetreault rig’s speed at 15 miles per hour when it started to slide and jackknife. The tachograph, which was removed from Tetreault’s tractor some hours after the accident, indicated that between 3:40 and 3:45 a.m., when this device ceased recording, the highest speed was 39 miles per hour and the lowest speed, apparently at the time of impact, was 8 to 10 miles per hour. We find that subject vehicle was proceeding downhill at a speed of 15 miles per hour when it went into the skid and jackknife which led to the crash into the bridge.
Claimants also presented a Mr. Wallace as a witness to the road condition. He testified that he drove a United Parcel van-type truck down said hill at about 3:15 a.m. ; that it was snowing fairly heavily; and, that the road was covered with snow and had not been plowed, sanded or salted. Mr. Wallace telephoned the State Department of Public Works’ barn, which was about half a mile from the hill, and advised the night watchman, Mr. Thomas, of the road condition.
Mr. Thomas stated that he telephoned Mr. Denton, the light maintenance foreman in charge of sanding and salting, at about 3:15 a.m. Mr. Denton testified that he left his home at about 3:25 a.m. and drove to the State barn where he loaded salt on his truck. In order to reach the State barn, Mr. Denton had to drive up the hill in question. He stated that at about 3:30 a.m. there was about an inch of snow on the road. He returned to the hill at about 3:45 a.m. to conduct his salting operation. When he reached the bottom of the hill he observed two tractor-trailer rigs parked and a tractor in the river as previously described.
*177 State Trooper Toth stated that he had passed this hill and intersection at about 1:17 a.m. and that it was not snowing at that time. He also passed the intersection at about 3:30 a.m. and he stated there was about an inch of snow on the hill at that time.
The United States Weather Bureau report indicated no snowfall in Elizabethtown on March 19 and 2.0 inches on March 20, 1963.
The facts that there was snow on this road, that the road was slippery, and that the subject vehicle skidded and jackknifed do not establish negligence against the State. (Quigley v. State of New York, 281 App. Div. 185, affd. 308 N. Y. 846; La Tournerie v. State of New York, 1 A D 2d 734.) Although the State is under a duty to maintain its highways in a reasonably safe condition for travel, it is not an insurer of the safety of its highways. Therefore, before we can fix the State’s liability, we must determine whether or not it met the standard of reasonable care in the maintenance of its highway under the circumstances prevailing. (Sweet v. State of New York, 195 Misc. 494.) Certainly, the State cannot be held to a standard of care which requires it to maintain a 24-hour watch over thousands of miles of highway during the Winter months. Such is particularly true in the mountain regions of northern New York, where many times a driver must weigh the necessity of reaching his destination against the readily perceivable dangers of continuing on his journey. (McCauley v. State of New York, 9 A D 2d 488, 490, revd. 8 N Y 2d 938; Cross v. State of New York, 21 Misc 2d 393, 395.)
After observing the witnesses and weighing their testimony, it is our opinion that under the existing circumstances said road condition had not existed an inordinate or unreasonable length of time; and, that the State employees reacted with celerity to the road situation when it was brought to their attention. We find that the State was not negligent in the maintenance of said road. It is also our opinion, and we so find, that the claimants did not sustain their burden of proving that Mr. Tetreault was free from contributory negligence.
We reserved decision on the State’s motions to dismiss the claims herein made at the end of claimants’ case and at the end of the trial. We now grant both of said motions.